IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MYRNA ZABREZNIK,

       Plaintiff,

v.                                   No. CIV 00-0931 LH/LCS

WILLIAM A. HALTER,
ACTING COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 13), filed March 2, 2001.  The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits.  The United States Magistrate Judge, having considered the Motion, memoranda, administrative record, and applicable law, finds that the motion is well-taken and recommends that it be **GRANTED**.

## PROPOSED FINDINGS

1.      Plaintiff, now fifty-six years old, filed her application for disability insurance benefits on May 12, 1997, alleging an onset date of September 13, 1996.  (R. at 15; 52-54.)  At the time she filed for benefits, Plaintiff was fifty-two years old.  (R. at 55.)  She has a high school education with two years of college and was previously employed as a real estate agent and  purchasing assistant. (R. at 54; 68; 246.)  Plaintiff's disability insured status expired on March 31, 1997. (R. at 15.)

2.      Plaintiff's application was denied at the initial level on June 26, 1997 (R. at 33), and

at the reconsideration level on September 24, 1997.  (R. at 34.)  Plaintiff appealed the denial of her claim by filing a Request for Hearing by Administrative Law Judge (ALJ) on November 24, 1997. (R. at 47.)  The ALJ held a hearing on October 8, 1998, at which Plaintiff appeared and was represented by counsel.  (R. at 236.)

3.      The ALJ issued her decision on December 9, 1998, analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).  (R. at 12-29.)  At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (R. at 15.)  At the second step, the ALJ determined that Plaintiff had severe impairments consisting of tinnitus, headaches, dizziness, and myofascial pain.  (*Id.*)  At the third step of the sequential analysis, the ALJ found that, at the time she last met the insured status requirements, Plaintiff did not have any disorder or combination of disorders meeting or equaling in severity any of those described in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501- .1599.  (R. at 15.)  The ALJ found that Plaintiff's testimony and other evidence did not credibly establish symptoms or functional limitations that would have prevented all work activity before her disability insured status expired, (R. at 16.), and that she retained the residual functional capacity for light or sedentary work.  (R. at 21; 24-25.)  At step four, the ALJ determined that Plaintiff was able to perform her past relevant work as a real estate agent or purchasing assistant.  (*Id.*)  At step five, using the Medical-Vocational Guidelines (Grids) as a frame work, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 26.)

4.      On February 18, 1999, Plaintiff filed a request for review of the ALJ's decision.  (R. at 10-11.)  On February 15, 2000, the Appeals Council extended time to submit additional evidence

relevant to the issues considered in the hearing decision of December 9, 1998.  (R. at 9.)  After the

Appeals Council denied the request for review on May 25, 2000, the decision of the ALJ became the

final decision of the Commissioner for judicial review purposes.  (R. at 6-7.)  Plaintiff filed this action

on June 28, 2000, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C.

§405(g).

**Standard of Review**

5.      The standard of review in this Social Security appeal is whether the Commissioner's

final decision is supported by substantial evidence and whether he applied correct legal standards.

*See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992).

Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion."

*Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting

*Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ

is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by

other evidence on the record.  *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for disability insurance benefits or supplemental security income,

a claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in substantial

gainful activity.  *See* 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F. 2d at 1486.  The

regulations of the Social Security Administration require the Commissioner to evaluate five factors

in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential

evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *See*

*Thompson v. Sullivan*, 987 F. 2d at 1487.

3

7.     At the first four levels of the sequential evaluation process, the claimant must show that she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.   At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *See id.*

**Administrative Record**

8.     Plaintiff contracted a flu-like illness on September 13, 1996 and stayed in bed for two weeks. (R. at 114.)  In January 1997, Plaintiff went to the Lovelace Clinic and was given antibiotics and antihistamines.  (*Id.*)  Plaintiff saw Dr. Dale Zimmerman, D.O., a family practitioner, on February 17 and 24, 1997. (R. at 123.)  Examination revealed tenderness over the cervical spine and cervical somatic dysfunction.  (*Id.*)  Dr. Zimmerman noted that Plaintiff had problems related to a condition that was  suspected to be Meniere's disease.[1]  (*Id.*)  Dr. Zimmerman diagnosed myofascial pain and treated Plaintiff with spinal manipulation, a facet injections and Amitriptyline to help Plaintiff's sleep. (*Id.*)  On February 24, 1997, Plaintiff reported that she had improved a great deal, and complained primarily of tightness and a buzzing sensation over her right ear.  (*Id.*)  Dr. Zimmerman recommended that Plaintiff return for follow-up treatment on an "as-needed basis."  (*Id.*)

9.     On June 4, 1997, Dr. John C. Adair, M.D., an Assistant Professor of Neurology at the

---

[1] Meniere's disease is a syndrome characterized by vertigo, nausea, vomiting, tinnitus, and progressive deafness due to swelling of the endolymphatic duct. Stedman's Medical Dictionary 500 (26th ed. 1995).

University of New Mexico School of Medicine, examined Plaintiff.  (R. at 127-129.)  Physical examination was unremarkable, except for dizziness and possible rotary nystagmus. (R. at 128.) Mental examination was essentially normal, with some rotary nystagmus and lid lag.  (*Id*.)  Dr. Adair noted that Plaintiff was taking Hydrochlorothiazide and diagnosed an "interesting case of vertigo and tinnitus" and suspected that a viral illness may have affected Plaintiff's labyrinth.[2]  (R. at 129.) Familiar vertigo and migraines were also suspected causes. (*Id*.)  Dr. Adair recommended that Plaintiff be tested for thyroid dysfunction and collagen vascular disease.  (*Id*.)

10.     On July 29, 1997, Melanie Rice, CFNP, MSN, wrote that Plaintiff had been treated at the First Nations Community Clinic and that she was unable to carry out functions of everyday living.  (R. at 143.)  On September 4, 1997, Dr. Adair examined Plaintiff and found fairly normal temporomandibular joint mobility, normal occlusion, intact cranial nerves and normal thyroid function tests.  (R. at 182.)  Dr. Adair noted that Plaintiffs condition "continued to baffle" him.  (*Id*.)  Dr. Adair reaffirmed his previous and ruled out any problem with the brain stem or suggestion of meningeal irritation.  (R. at 183.)

11.     On November 20, 1997, Dr. Frederick Fiber, M.D., an ear, nose and throat specialist, examined Plaintiff for the purpose of rendering a second opinion.  (R. at 158.)  Dr. Fiber's clinical impression was post-inflammatory labyrinthitis, vestibular neuronitis, mild encephalitis, cochlear hydrops and vestibular hydrops.  (*Id*.)  Dr. Fiber stated that he would be unable to render a complete opinion with a neurological examination.

12.     On December 30, 1997, Dr. Mark L. Berger, M.D., a neurologist, examined Plaintiff.

---

[2]   The labyrinth is the internal or inner ear, composed of the semicircular ducts, vestibule, and cochlea.  Stedman's Medical Dictionary 927 (26th ed. 1995). Labyrinthitis is inflamation of the inner ear, sometimes accompanied by vertigo and deafness. *Id*. at 928.

(R. at 175.)  Dr. Berger observed good muscle tone, bulk and strength throughout, and ordered an

MRI and an EEG. (*Id.*)  Both the MRI and the EEG were "entirely normal." (R. at 172.)  Dr. Berger

diagnosed dizziness and tinnitus following infection with no other neurological condition. (*Id.*)

13.     On March 12, 1998, Plaintiff told Dr. Adair that she had been doing better and that

her tinnitus had resolved.  (R. at 180.)  Plaintiff believed that the improvement might be related to a

multivitamin and increased compliance with her prescribed medications.  (*Id.*)  Physical examination

was essentially normal with lid lag as noted previously but no nystagmus.  (R. at 181.)  Hearing

examination showed decreased air conduction on the right.  (*Id.*)  Dr. Adair wrote that he was still

uncertain as to the specific etiology of Plaintiff's complaint, but suspected she had some type of

labyrinthitis whose natural course was somewhat protracted possibly due to complications related to

complex physical and psycho-social factors.  (*Id.*)

14.     On May 20, 1998, Dr. Zimmerman recounted that Plaintiff had "an excellent relief of

pain" after she received his prior treatments of spinal manipulation and trigger point injections.  (R.

at 185.)  In fact, Dr. Zimmerman noted that Plaintiff had a very intense headache before the February

1997 treatments, but that afterwards the headache went away and never returned.  (*Id.*)  Dr.

Zimmerman concurred with the diagnosis of chronic recurrent labyrinthitis, and opined that some of

the symptoms could be related to a poorly fitting lower denture.  (*Id.*)  Physical examination revealed

a decreased range of motion in Plaintiff's neck with palpable trigger points.  (*Id.*)  Sensory and motor

function were intact.  (*Id.*)  Dr. Zimmerman assessed chronic recurrent labyrinthitis, responding

reasonably well to conservative treatment and chronic recurrent myofascial pain, perhaps related to

the labyrinthitis and exacerbated by a poorly fitting lower denture. (*Id.*)

15.     On June 22, 1998, Plaintiff was referred to Judy Venzel, MPH, LPCC, a therapist at

First Nations Clinic, for counseling due to Plaintiff's complaints of depression. (R. at 209.) In her therapy notes, Ms. Venzel noted that Plaintiff was able to deal with emotions in non-abusive ways and no longer verbally abused her roommate. (R. at 205.) Ms. Venzel recorded that a hearing aid afforded Plaintiff some relief and that Plaintiff appeared to be coping better. (R. at 206.) On August 18, 1998, Plaintiff requested that her therapy sessions be reduced to once per month. (*Id.*)

16.     On August 18, 1998, Ms. Venzel wrote that Plaintiff had attended several therapy sessions and was working hard to identify appropriate coping skills to deal with her physical condition. (R. at 199.) Ms. Venzel completed a Mental Impairment Questionnaire and stated that Plaintiff suffered from poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, perceptual disturbances, social withdrawal, feelings of guilty and worthlessness, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, somatization unexplained by organic occurrence, hostility and irritability. (R. at 202-203.). Ms. Venzel rated the restrictions on activities of daily living and difficulties maintaining social functioning at marked, deficiencies in concentration, persistence and pace at constant and episodes of deterioration in a work or work-like setting at repeated. (R. at 204.)

17.     On September 11, 1998, Melanie Rice, CFNP, MSN, wrote that Plaintiff had been treated at the First Nations Community HealthSource since April 4, 1997 for complaints of intermittent severe facial pain, acute sensitivity to variations in barometric pressure, tinnitus, headaches and inability to remain vertical without vertigo. (R. at 196.) Ms. Rice explained that Plaintiff had been diagnosed with conditions relating to fluid within her inner ear and had undergone conservative treatment including dietary restrictions, bed rest, and avoidance of barometric changes with little relief. (R. at 197.) Ms. Rice further stated that Plaintiff needed to avoid lifting, straining,

bending over, changes in air pressure, and "any activity increasing the sensation of pressure in the head." (*Id.*) Based on these limitations, Ms. Rice expressed the belief that Plaintiff's ability to work was reduced and she was unable to maintain the activities of daily living at their previous levels. (*Id.*) Ms. Rice also noted that Plaintiff had been referred to a mental health professional because her condition was "depressing." (R. at 198.) Dr. Carroll Goon, M.D., the clinic Medical Director, reiterated Ms. Rice's opinions. (R. at 224.)

18.    The record contains letters from Plaintiff's family and friends, describing Plaintiff's inability to function, her headaches, low stamina, need to lie down, impaired memory, and mood swings. (R. at 210-13.) The record also contains Plaintiff's journal entries regarding her condition. (R. at 113-14.) On April 18, 1997, Plaintiff wrote that "as long as I take all the pills prescribed by the clinic, I feel pretty good, and the face pain and headache is [sic] under control." (R. at 113.)

19.    At the October 8, 1998, evidentiary hearing, Plaintiff testified that she last worked for temporary employment agencies and was laid off in August 1997. (R. at 246.) In September 1997, Plaintiff fell ill, presumably with a virus. (R. at 246-51.) Plaintiff's daughter suffered the same sort of attack, but the daughter's condition resolved in about three days and she was able to work. (R. at 258; 266.) Plaintiff subsequently received antibiotics, and felt a little better after the second course. (R. at 250-51.) After the infection, Plaintiff continued having intermittent fevers, ringing in her ears, headaches, vertigo, and face pains. (R. at 251-57.) Plaintiff was prescribed Hydrochlorothiazide to drain the fluid off her ears and Amitriptyline to help her sleep. (R. at 254-55.)

20.    Plaintiff testified that her vertigo and tinnitus caused her to bump into objects and she was unable to drive. (R. at 259-60.) She was able to go grocery shopping and defrost the refrigerator. (R. at 264.) Plaintiff testified that she attempted to learn a medical billing program, but

was unable to accurately work on it due to deficiencies in concentration.  (R. at 265.)  Plaintiff also suffered from anxiety attacks.  (R. at 268.) The ALJ did not receive testimony from a vocational expert.

**Discussion**

21.    In support of her Motion to Remand or Reverse Administrative Agency, Plaintiff argues that the ALJ's decision is not supported by substantial evidence; the ALJ failed to consider non-medical evidence of her impairments; the ALJ incorrectly found that she retained the residual functional  capacity for sustained employment; the ALJ erred in relying on the grids; the Appeals Council failed to consider new and material evidence; and broad policy and general public interest require remand of this case.

22.    Plaintiff argues that the ALJ's step three determination is not supported by substantial evidence.  At first, Plaintiff argues that her condition at least equals Listing 2.07, but then she admits that her impairment falls short of meeting or equaling this listing.  (Pl. Br. at 10.)  Listing 2.07 requires a "disturbance of labyrinthine-vestibular function demonstrated by caloric and other vestibular tests and a progressive loss of hearing."  Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  The ALJ observed that Plaintiff's "[c]aloric, and other vestibular tests in May and November, 1997 were essentially normal and showed no clear sign of ear disease" and "[a]udiological testing in April 1997 was likewise normal."   Based on this evidence, the ALJ concluded that Plaintiff's condition failed to meet Listing 2.07 on or before March 31, 1997. (*Id.*)

23.    Plaintiff has the burden at step three of demonstrating, through medical evidence, that her impairments "meet all of the specified medical criteria" contained in a particular listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Plaintiff failed to establish that she satisfied the medical criteria

of Listing 2.07. Substantial evidence supports the ALJ's determination that Plaintiff was not disabled at step three.

24.     Plaintiff asserts that the ALJ's treatment of her pain complaints is not supported by substantial evidence. In evaluating a claim of disabling pain, the appropriate analysis considers (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain, and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling. *Glass v. Shalala*, 43 F. 3d 1392, 1395 (10th Cir. 1994) (citing *Luna v. Bowen*, 834 F. 2d 161, 163 (10th Cir. 1987)). The ALJ properly applied these factors in this case.

25.     For instance, the ALJ observed that Plaintiff received only minimal and conservative treatment before March 31, 1997, the expiration of her insured status. (R. at 24.) Plaintiff's positive journal entries and statements to her treating physicians that her condition had improved and that the treatments were working were also evaluated. (R. at 16-20.) The ALJ further discussed Plaintiff's ability to perform a wide range of daily activities at the time she filed her application for benefits. (*Id.*) Based on all the evidence, the ALJ concluded that the record did not establish that Plaintiff suffered from disabling pain prior to March 31, 1997. (R. at 24) This determination is supported by substantial evidence and the ALJ applied correct legal standards.

26.     Significantly, the ALJ assessed the consistency of the non-medical testimony with the objective medical evidence and found Plaintiff's credibility to be lacking. (R. at 21-22.) Although Plaintiff does not challenge the ALJ's credibility determination, credibility is a key factor is cases involving complaints of disabling pain. *See Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir.1995). Plaintiff established that she suffers from a pain-producing impairment. The ALJ was therefore

required to consider her complaints of pain by evaluating her use of pain medication, her attempts to obtain relief, the frequency of her medical contacts, the nature of her daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. (*Id.*) The ALJ correctly analyzed these factors in her decision and her credibility determination is supported by substantial evidence.

27.     The ALJ discounted Ms. Rice's opinion that Plaintiff's ability to work was reduced because it was inconsistent with the medical record. (R. at 23; 197). Plaintiff claims this was error because Ms. Rice treated Plaintiff over a long period of time. "A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F. 3d 288, 289-90 (10th Cir.1995). A treating physician's opinion may be disregarded if it is not supported by specific findings or if it is inconsistent with other substantial evidence in the record. *Castellano v. Secretary*, 26 F. 3d 1027, 1029 (10th Cir. 1994) Opinions of those other than trained medical doctors, such as nurses, are not afforded the same weight as the opinions of physicians. *See* 20 C.F.R. §§ 404.1513, 416.913. In this case, the ALJ considered Ms. Rice's opinion and observed that it was inconsistent with the other medical evidence of record and Ms. Rice's own progress notes. This determination is supported by substantial evidence and the ALJ properly disregarded the opinion of Ms. Rice.

28.     The ALJ also disregarded Ms. Venzel's opinion that Plaintiff suffered from a mental impairment. The ALJ discounted this opinion because it was inconsistent with her positive progress notes. (R. at 199-204.) The record establishes that Plaintiff has an affective disorder, but is insufficient to ascertain the full extent of this condition and the impact on Plaintiff's ability to work. The ALJ has a basic duty of inquiry in every case. *Dixon v. Heckler*, 811 F. 2d 506, 510 (10th Cir.

1987).  If medical sources cannot or will not provide sufficient medical evidence, then the ALJ can order a consultative examination.  *See* 20 C.F.R. § 416.917.  The ALJ has broad latitude in ordering such examinations.  *Diaz v. Secretary of Health and Human Services*, 898 F. 2d 774, 778 (10th Cir. 1990).

29.    In deciding whether the ALJ erred in not ordering a consultation, the Court must consider whether there is sufficient medical evidence in the record so that the ALJ can make an informed decision without a consultative examination.  *Matthews v. Bowen*, 879 F. 2d 422, 424 (8th Cir. 1989). In this situation there is scant evidence concerning the effect of the Plaintiff's mental condition on her ability to work.  The ALJ could not have made an informed decision without a psychological consultation.   A remand is thus required for the ALJ to obtain a psychological consultatative examination.

30.    Plaintiff argues that the ALJ incorrectly found that she retained the residual functional capacity for sustained employment.  The ALJ determined at step four that Plaintiff was able to perform her past relevant work as a real estate agent or a purchasing assistant.  (R. at 25.)  In arriving at the vocational and physical requirements of Plaintiff's past work, the ALJ relied on the Dictionary of Occupational Titles.  (*Id.*)  The ALJ did not explore the requirements of Plaintiff's past work at the hearing and did not receive the testimony of a vocational expert.  This was error.

31.    The ALJ has a duty to develop the record regarding the requirements of  Plaintiff's past work at step four.  *Henrie v. Department of Health and Human Services*, 13 F. 3d 359, 360-61 (10th Cir. 1993).  Step four is comprised of three phases.  *See Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996).  In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity.  *See id.* (*citing Henrie*, 13 F. 3d at 361).  In the second phase, the ALJ

must determine the physical and mental demands of the claimant's past relevant work. *See id.* In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. *See id.*

32.     At the second phase of the step four analysis, the ALJ is required to make findings regarding the physical and mental demands of the claimant's past relevant work.  To make these findings, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations." *Winfrey v. Chater*, 92 F. 3d 1017, 1023.  In this case, the ALJ failed to develop the record and failed to make findings regarding the physical and mental requirements of Plaintiff's past relevant.  Under these circumstances, a remand is required under *Henrie* and *Winfrey*.  On remand, the ALJ should inquire into and findings specifying the mental and physical demands of Plaintiff past relevant work.

33.     The ALJ did not stop at step four.  After determining that Plaintiff was able to perform her past relevant work, the ALJ proceeded to step five and, using the Grids as a framework, found that the Grids directed a finding the Plaintiff was not disabled. (R. at 25-26.)  At step five, the burden of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity to do work which exists in the national economy. *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th Cir. 1993). In certain cases, at the fifth step, the ALJ may rely solely on the Grids.

34.     The Grids assume that a claimant's sole limitation is lack of strength, also known as an exertional impairment. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).  In a case such as this, where a claimant presents evidence of both exertional and non-exertional impairments, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations.  *Id.*  If the non-exertional limitations are significant enough to further reduce

work capacity, the ALJ may not rely solely on the Grids but must instead give full consideration to all relevant facts, including expert vocational testimony if necessary, in order to determine whether a claimant is disabled. *See Channel v. Heckler*, 747 F. 2d 577, 583 (10th Cir. 1984).

35.     In other words, the grids cannot be used conclusively when a non-exertional impairment limits a claimant's ability to perform the full range of work in a particular residual functional capacity category. *See Talbot v. Heckler*, 814 F. 2d 1456, 1460 (10th Cir. 1987). When non-exertional limitations are present, the grids can only be used as a framework for considering the extent to which such limitations further diminish the claimant's ability to work by reducing the types of jobs that the claimant would otherwise be able to perform. *Talbot*, 814 F.2d at 1460; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00 (e)(2). In assessing the extent to which a claimant's ability to work is eroded by his non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert. *See Hargis v. Sullivan*, 945 F. 2d 1482, 1491 (10th Cir. 1991).

36.     In this case, the ALJ found that Plaintiff had the residual functional capacity for light and sedentary work which was not limited by her non-exertional impairments. This determination is not supported by substantial evidence.  The record establishes that Plaintiff suffered from some degree of chronic pain, tinnitus and vertigo that affected her ability to work.  Plaintiff also suffers from a mental condition.   Under these circumstances, reliance on the grids at step five was inappropriate, especially in light of Plaintiff's age. *See Dikeman v. Halter*, ____ F. 3d ____ slip op. at 3-4 (10th Cir. Apr. 12, 2001) (discussing limitations on application of grids to claimants over fifty).  On remand, if the case proceeds to step five, the ALJ should not rely on the grids, but should instead obtain the testimony of a vocational expert.

37.     After Plaintiff received the hearing decision, she alleges that she sought to services of

the Division of Vocational Rehabilitation, a state agency, to attempt to return to work   Plaintiff submitted two letters from agency employees to the Appeals Council.   The Appeals Council considered the letters, but did not include them in the record because it found that they were not new and material.  (R. at 6.)  Plaintiff contends that the Appeals Council's failure to consider this evidence was error.  Findings by other agencies are entitled to weight and must be considered, but are not binding on the Commissioner.  *Baca v. Department of Health & Human Servs.*, 5 F. 3d 476, 480 (10th Cir. 1993).  On remand, the ALJ should consider these two letters along with the rest of the record to determine whether Plaintiff is disabled within the meaning of the Social Security Act.[3]

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 13), filed February 12, 2001, be granted and that this matter be remanded to the Commissioner for the ALJ to obtain a consultative psychological examination, to make inquiry into and findings specifying the mental and physical demands of Plaintiff past relevant work at step four, for vocational expert testimony in the event the analysis proceed to step five, and for consideration of the two letters from Division of Vocational Rehabilitation employees.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party

---

[3]  In light of the foregoing determination, it is not necessary to address Plaintiff's argument that broad policy and general public interest require that the case be remanded.

wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**